|  |  |  |
|---|---|---|
| THE CONTINENTAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. 2:14–CV–00382 |
| GEORGE J. BEEMSTERBOER, INC., BEEMSTERBOER SLAG & BALLAST CORPORATION, and CALUMET TRANSLOAD RAILROAD LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Partial Summary Judgment filed by Plaintiff Continental Insurance Company ("Continental"), on June 8, 2015 (DE# 23), and the Motion for Partial Summary Judgment against Plaintiff as to Liability on Count I of Plaintiff's Complaint and Counts I, II and IV of Defendants' Amended Counterclaims, filed by Defendants George J. Beemsterboer, Inc., Beemsterboer Slag & Ballast Corporation, and Calumet Transload Railroad LLC (collectively, "Beemsterboer") on June 8, 2015 (DE# 24). For the reasons set forth below, Continental's Motion for Partial Summary Judgment (DE# 23) is **GRANTED.** Beemsterboer's Motion for Partial Summary Judgment (DE# 24) is **DENIED.**

FACTS

For the purposes of these motions for partial summary judgment, the facts below are undisputed:

Continental Insurance Policy

Continental issued insurance policy numbers H0864659 and H0864870 (the "Policies") to Beemsterboer.[1] The declarations pages of the Policies indicate they are "hull" insurance policies with limits of $1 million. The Policies include the following coverage:

LANDING DOCK BAILEE LIABILITY

1. In consideration of the stipulations hereinafter named and the payment of premiums as hereinafter provided, and subject to the limits of the liability, exclusions, conditions and other terms of this policy, this Company agrees to indemnify the Insured to the extent of this policy's proportion as hereinafter stated of all sums which the Insured shall become obligated to pay:

A. By reason of the liabilities imposed upon the Insured by law for accidental:

(1) loss of or damage to barges and to towboats, their equipment, cargo, freight, and other interests on board . . . , the property of others while such property is in the custody of the Insured at their landing and mooring facilities described below, but excluding all liability for loss or damage resulting

---

[1]Continental issued policy number H0864659 to Beemsterboer in effect from September 15, 2007, to September 15, 2008. The policy was renewed annually through September 15, 2013. The policy number changed to H0864870 for the September 15, 2013, to September 15, 2014, policy period.

from loading or unloading operations performed by or for the Insured;

(2) loss of or damage to barges, their equipment, cargo, freight and other interests on board . . . the property of others, while such property is in the custody of the Insured at their landing and mooring facilities described below resulting from loading or unloading operations performed by or for the Insured;

(3) loss of or damage to property of others (other than as described above), including vessels of not exceeding 750 net registered tons approaching, at, and departing from the landing and mooring facilities described below, or for loss of life or personal injury; if arising out of only those operations covered above.

. . .

2. Coverage under Clauses 1A(1) and 1A(2) attaches from the moment the said barges or towboats become at risk of the Insured at premises as specified below and covers continuously thereafter until removed from said premises, or until no longer at the risk of the Insured, whichever shall first occur. . . .

. . .

4. This policy applies only to the Insured's landing and mooring facilities on the

MM [mile marker] 330, Calumet River at 106th St., Chicago, IL
Calumet River at 10730 Burley Ave., Chicago, IL

. . .

(DE# 25-1 at 9-10.) Paragraph 5 includes the following relevant exclusion, "Exclusion K":

5. Notwithstanding the foregoing, it is hereby expressly understood and agreed that this insurance does not cover against nor shall any liability at each hereunder:

. . .

> K. For any loss, damage, cost, liability or expense of any kind or nature whatsoever, imposed on the Insured, directly or indirectly in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

(*Id.* at 11.) Paragraph 8 requires the Insured to log the arrival and departure of each vessel at risk under Section lA(1) or 1A(2), which is then used to compute the earned premium for the Policies, as follows:

> $6.45 per vessel per day or any part thereof for coverage provided by Clause lA(1) and an additional premium of

> $Incl. per vessel per day or any part thereof for coverage provided by Clause 1A(2) if such vessel was either loaded or unloaded by or for the Insured during the period of custody and an additional premium of

> $Incl. per vessel per day or any part thereof for coverage provided by Clause 1A(3)

> $125 per vessel berthing

. . .

(*Id.*) The Policies also include the following relevant exclusion:

EXCLUSION - RESPIRABLE DUST

It is understood and agreed that this insurance does not apply to any liability for, or any loss, damage, injury or expense caused by, resulting from, or incurred by reason of any one or more of the following:

-4-

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust"; or

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust"; or

3. "Personal and advertising injury" arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust".

The following definition applies herein:

"Respirable dust" means respirable particulate matter but does not include living organisms.

(*Id.* at 27.)

<u>The Class Action Litigation</u>

In 2013, a consolidated class action complaint ("Class Action Complaint") was filed against Beemsterboer and other defendants in the United States District Court for the Northern District of Illinois entitled, *Rosalio Campos, et al. v. BP Products North America, Inc., et al.,* Case No. 1:13-cv-08376 ("Class Action Litigation").[2]   (DE# 25-2.)   According to the Class Action Complaint, defendants George J. Beemsterboer, Inc. ("Beemsterboer Inc.") and Beemsterboer Slag & Ballast Corporation ("Beemsterboer Slag") own, maintain, and/or control a storage and transfer

_____

[2] The Class Action Litigation consolidated *Martin v. KCBX Terminals Co.,* No. 1:13-cv-8376 (N. Dist. Ill.), *Murphy v. BP Products North America, Inc.,* No. 1:13-cv-8499 (N. Dist. Ill.), and *Figueroa v. BP Products North America, Inc.,* No. 1:13-cv-9038 (N. Dist. Ill.).

terminal at 2900 East 106th Street in Chicago, situated on the west bank of the Calumet River ("106th Street Facility" or "Facility"), and defendant Calumet Transload Railroad LLC owned, operated, maintained and controlled a storage transfer terminal located at 10730 South Burley Avenue in Chicago, situated in the east bank of the Calumet River, until February 8, 2007 (together, the "Facilities"). (*Id.* ¶¶ 17, 20-21, 23).

The Class Action Complaint alleges that Beemsterboer failed to take reasonable measures to prevent petroleum coke ("pet coke") and coal dust stored outside at the Facilities from contaminating nearby communities. Pet coke is alleged to be a lightweight and dust-like byproduct of the crude oil refining process that contains high concentrations of carbon and sulfur and trace elements of metals. At these Facilities, "petcoke and coal dust was and continues to be stored outside in large uncovered piles. The concerned piles of petcoke and coal dust are sometimes as high as five stories." (*Id.* ¶ 44). The Class Action Complaint alleges that pet coke and coal dust has blown throughout the communities surrounding the Facilities, contaminating the air and coating homes, yards, schools, parks and other property, thereby reducing property values and interfering with the plaintiffs' use and enjoyment of the property. It also alleges that pet coke can be inhaled, and that if inhaled, pet coke can be harmful. It attaches a Safety Data Sheet for pet coke indicating that it may form a

combustible dust that should not be breathed. The Class Action Complaint also alleges that the Illinois Environmental Protection Agency ("IEPA") issued a violation notice to Beemsterboer, alleging violations of environmental laws, regulations and permits, and that Beemsterboer caused, threatened, or allowed "the discharge of particulate matter into the atmosphere generated during material handling operations causing or tending to cause air pollution." (*Id.* ¶ 47(f); *see also id.* ¶¶ 46 & 48, Ex. F.)

The Class Action Complaint alleges legal and factual questions relevant to resolution of the case, including "[w]hether Defendants' conduct in the refining, manufacturing, handling, transporting, or storing of oil byproducts resulted in the release, discharge, or spilling of petcoke waste." (*Id.* ¶ 63(b).) It also alleges that Beemsterboer and other defendants "had a duty to act with reasonable care in . . . storing, distributing, and selling petcoke and coal dust in such a way that petcoke and coal dust would not migrate onto and contaminate Plaintiffs' and Class members' property." (*Id.* ¶ 102.)[3] One of the plaintiffs in the

---

[3] In addition, the Class Action Complaint alleges that Beemsterboer and other defendants "manufactured, sold, distributed, and marketed a product, petcoke, under circumstances and in a condition that was unreasonably dangerous in that petcoke is a hazardous material which becomes airborne when transported and stored without being enclosed," (*id.* ¶ 91), "did in fact distribute, store, and sell petcoke" (*id.* ¶ 108), and "entered into an agreement to sell, transport, and distribute petcoke" (*id.* ¶ 111). The claims relating to these allegations were dismissed from the Class Action Litigation in 2014. (*See* DE# 25-3.)

Class Action Litigation ("Class Action plaintiffs"), Lilly Martin, testified in a deposition that the allegations in the Class Action Complaint include damages to her property from pet coke and coal dust generated while being transferred from barges and ships by Beemsterboer at their Facilities. (DE# 31-1.)

State Litigation

On November 2, 2013, the State of Illinois and the City of Chicago commenced a lawsuit against defendants Beemsterboer Inc. and Beemsterboer Slag in the Circuit Court of Cook County, Chancery Division, entitled, *People of the State of Illinois, ex rel. v. George J. Beemsterboer, Inc., et al.,* No. 13 CH 26175 ("State Litigation"), claiming that Beemsterboer's pet coke handling and storage operations at the 106th Street Facility were causing damage to surrounding properties. The original complaint in the State Litigation ("State Complaint") alleges that Beemsterboer violated several state and local air pollution laws due to dust created by the loading, off-loading, and storage of pet coke and other materials emanating from the Facility. (DE# 11-4.) On March 27, 2014, the State Complaint was amended ("State Amended Complaint").[4] (DE## 30, 30-1.)

---

[4] In their summary judgment briefs, the parties sometimes cite to the State Complaint in addition to, or in lieu of, the State Amended Complaint. The State Amended Complaint is nearly identical to the original State Complaint, though it adds several new claims against the defendants. (*See* DE# 32 at 9 ("The original complaint in the State [Litigation] appears to be identical to the Amended

The State Amended Complaint repeatedly alleges that Beemsterboer was "engaged in the storage, handling, screening, loading and unloading" of pet coke and other materials (together, "Unpermitted Materials"). (DE# 30-1 Count I ¶ 8; *see, e.g., id.* Count II ¶ 33, Count III ¶ 40.) It alleges that "Unpermitted Materials have been shipped to the Facility via the Calumet River on boats and barges," and that Beemsterboer has "operated two boat loaders to load Unpermitted Materials and coal onto boats on the Calumet River ('Boat Loaders')." (*Id.* Count I ¶¶ 9, 13.) It states that since June 2013, "fine particles of Unpermitted Materials and coal ('Particulate Matter') – including particles of less than 10 microns in diameter (PM 10) and particles of less than 2.5 microns in diameter (PM 2.5) – have been escaping Defendants' Facility during periods of moderate and heavy wind and inundating the surrounding residential communities with black dust," and that Beemsterboer "exposed substantial quantities of Particulate Matter to the environment, thereby causing or threatening the emission of Particulate Matter so as to cause air pollution. . . ." (*Id.* Count I ¶ 20, 30-31.) The complaint identifies Beemsterboer's "Unpermitted Materials Piles, Screener, Conveyor and Boat Loaders" as sources that emit or have the

---

Complaint . . . except for the addition of Counts XIV through XIX").) As such, the Court will only address the more fulsome allegations in the State Amended Complaint.

potential to emit air pollutants. (*Id.* Count VII ¶¶ 29-30.)  It also identifies three emission sources listed in 35 Ill. Adm. Code 212.316 as "relevant" to certain claims against Beemsterboer: 1) "emissions generated by the crushing and screening of slag, stone, coke or coal"; 2) "emissions from any roadway or parking area"; and 3) "emissions from any storage piles." (*Id.* Count IV ¶ 34.)

The State Amended Complaint brings several claims against Beemsterboer alleging violations of state and local air pollution laws. (*See, e.g., id.* Count I ¶ 31 (Beemsterboer allegedly violated Illinois air pollution laws "by causing or threatening the emission of Particulate Matter so as to cause air pollution"); Count II ¶ 36 (alleging Beemsterboer violated Illinois air pollution laws "[b]y storing, handling, screening, loading and unloading Unpermitted Materials at the Facility"); *id.* Count III ¶ 42 (alleging Beemsterboer violated 415 ILCS 5/9(b) and 35 Ill. Adm. Code 201.143 "[b]y storing, handling, screening, loading and unloading Unpermitted Materials at the Facility and operating the Screener"); *id.* Count IX ¶¶ 17, 24 (alleging Beemsterboer "caused or permitted the use, handling, loading, unloading, storing, depositing, or scattering of substance(s) or material(s) that may become airborne or be scattered by the wind without taking reasonable precautions to minimize air pollution" in violation of local laws); *id.* Count X ¶ 24 (same).)  It also alleges that Beemsterboer violated Illinois water pollution laws by releasing

pet coke and other materials into the Calumet River (*id*. Counts XIV through XVII), and violations of waste storage laws (*id*. Counts XVIII and XIX). The plaintiffs in the State Litigation seek several remedies, including injunctive relief, civil penalties, and an order for Beemsterboer to pay all costs, including oversight, sampling, and clean-up costs.

Declaration of Simon Beemsterboer

Simon Beemsterboer, the president of defendant Beemsterboer Slag, submitted a declaration asserting that Beemsterboer loads and unloads pet coke from ships and barges docked at the Facility. (DE# 29 ¶ 9.) According to Mr. Beemsterboer, pet coke was loaded and unloaded from docked ships and barges by bucket loader or conveyor belt. (*Id*. ¶ 11.) During the loading and unloading of pet coke from docked ships and barges, "there was a short time when the petcoke dust was airborne due to handling process," despite Beemsterboer's best efforts to limit it. (*Id*. ¶ 12.) "[A]irborn releases and run-off into the Calumet River were possible during loading and unloading operations from uncovered ships and barges" docked at the Facility. (*Id*. ¶ 14.) Beemsterboer tendered an insurance claim to Continental requesting that it indemnify and defend Beemsterboer in the Class Action Litigation and the State Litigation. (*Id*. ¶ 8.)

<u>Procedural History</u>

Continental refused to defend Beemsterboer in the Class Action Litigation and filed the instant Complaint seeking a declaratory judgment that it has no duty to defend or indemnify Beemsterboer in the Class Action Litigation (DE# 1, Count I). Beemsterboer filed counterclaims of breach of contract based on Continental's failure and refusal to defend and indemnify it in the Class Action Litigation and State Litigation (DE# 11, Am. Countercl. Counts I and II), breach of duty of good faith based on Continental's failure and refusal to defend and indemnify it in the Class Action Litigation and the State Litigation (*id*. Count III), and declaratory relief, seeking a declaratory order that Continental is liable for breach of contract for denying its claims under the Policies (*id*. Count IV). This case is before the Court pursuant to admiralty or maritime jurisdiction. (DE# 1 (Compl. ¶ 10) (citing 28 U.S.C. § 1333).[5]

Continental and Beemsterboer filed the instant motions for partial summary judgment regarding on the issue of Continental's alleged duty to defend Beemsterboer in connection with the Underlying Complaints. Continental's motion asks the Court to

_____

[5] In its summary judgment brief, Beemsterboer asserts that this case is before the Court by virtue of its diversity jurisdiction. (DE# 26 at 5.) However, both Beemsterboer's Answer and Amended Counterclaim allege that jurisdiction is conferred upon this Court solely by 28 U.S.C. § 1333. (*See* DE# 9 (Ans. ¶ 10), DE# 11 (Amend. Countercl. ¶ 5).)

find that the Policies do not provide coverage for the claims in the Class Action Litigation, and therefore Continental has no duty to defend Beemsterboer in the Class Action Litigation. (DE# 23 at 3.) Beemsterboer opposes this motion, and moves for summary judgment asking the Court to find that Continental has a duty to defend Beemsterboer in both the Class Action Litigation and the State Litigation based on the language of the Policies (Counts I, II and IV of Beemsterboer's Amended Counterclaim). (DE# 24 at 2.) Beemsterboer also seeks a stay of this action pending the outcome of the Class Action Litigation and the State Litigation. (*Id.*) Continental opposes Beemsterboer's motion. (DE# 32.)


SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine dispute of material

fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in his own pleading, but rather must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). The party with the burden of proof on an issue can obtain a summary judgment "only where the evidence is so one-sided that it points inescapably" in the movant's favor, and "every reasonable jury" would decide that the movant has met its burden of proof. *Thorne v. Member Select Ins. Co.,* 899 F. Supp. 2d 820, 824 (N.D. Ind. 2012) (citations omitted). If the non-moving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d

746, 747 (N.D. Ind. 2002).  For the purpose of the parties' motions for partial summary judgment, no dispute of material fact exists. Rather, the motions raise issues of insurance contract interpretation.

DISCUSSION

Choice of Law

As an initial matter, the parties disagree as to which law applies to the Policies.  Continental asserts that federal maritime law should apply, while Beemsterboer argues that Indiana law applies.  The parties agree that the Policies are maritime contracts, but not "every term in every maritime contract can only be controlled by some federally defined admiralty rule.  In the field of maritime contracts, as in that of maritime torts, the National Government has left much regulatory power in the States." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313, 75 S. Ct. 368, 99 L. Ed. 337 (1955).  "[T]his state regulatory power, exercised with federal consent or acquiescence, has always been particularly broad in relation to insurance companies and the contracts they make."  *Id.* at 314 (citations omitted).

In *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004), the Supreme Court held that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract

interpretation." *Id*. at 22-23 (citations omitted). Federal substantive law should govern "when state interests cannot be accommodated without defeating a federal interest." *Id*. at 27. Relying on *Norfolk*, Continental argues that this dispute is not inherently local because the Class Action Complaint and the State Amended Complaint (together, "Underlying Complaints") allege that an Indiana corporate citizen allegedly harmed Illinois citizens. Since *Norfolk*, at least one court in this Circuit has held that "state law controls disputes involving marine insurance policies in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." *Egan Marine Corp. v. Great Am. Ins. Co. of New York,* 531 F. Supp. 2d 949, 953 (N. D. Ill. 2007) (citation and internal quotation omitted). The parties agree that no federal statute applies to the issues of contract interpretation presented here. (DE# 31 at 9; DE# 33 at 4.) They do not assert that any specific federal judicially-created rule governs the interpretation of the Policies, and the Court finds none.[6] *See Littlefield v. Acadia*

---

[6]Continental argues that the analysis of whether the Policies apply to the Underlying Complaints "cannot be separated from the basic tenants of maritime law, such as the judicially fashioned admiralty rules that maritime policies insure maritime risks." (DE# 33 at 4-5 (citing federal case law holding that a wharfinger is legally liable for (1) keeping docked vessels adequately moored, (2) caring for vessels while in its custody, and (3) keeping the berth and its approaches in a safe condition for mooring vessels).) However, Continental does not cite any case law applying specific federal judicially-created rules to interpret maritime insurance policies.

*Ins. Co.*, 392 F.3d 1, 6-7 (1st Cir. 2004) (finding no applicable federal statute or judicially-created rule, and declining to create a new federal rule, in evaluating whether an exclusion in a maritime insurance contract was ambiguous); *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999) (finding "no specific federal rule governing construction of maritime insurance contracts").

Federal courts have held that general principles of contract law are used to interpret marine insurance policies. *See Littlefield*, 392 F.3d at 6 (citing *Commercial Union*, 190 F.3d at 30, *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 306 (2d Cir. 1987) (noting that the principle that an ambiguous insurance contract "will generally be construed against the insurer who drafted it in order to promote coverage for losses to which the policy relates" applies to "maritime policies"), and *Kalmbach, Inc. v. Ins. Co. of the State of Pa.,* 529 F.2d 552, 555 (9th Cir. 1976) ("[W]e can see no significant difference between construction of an ordinary insurance policy and one with marine insurance overtones.")); *Essex Ins. Co. v. Detroit Bulk Storage*, No. 11-13277, 2014 WL 3687032, at *6 (E.D. Mich. July 23, 2014) (noting that "general federal maritime law has adopted the standard axiomatic rules of contract interpretation and construction"). The parties have not asserted, and the Court does not discern, any direct conflict between federal maritime law and Indiana law on

contract interpretation.  The Court finds no reason to fashion any new federal rule here, and instead, will apply Indiana law in evaluating the language of the Policies.[7]  *See Wilburn*, 348 U.S. at 321 (suggesting that courts, "like Congress, leave the regulation of marine insurance where it has been – with the States").

Indiana Law

In Indiana, "[t]he interpretation of an insurance policy is primarily a question of law for the court, and it is therefore a question which is particularly suited for summary judgment." *Wagner v. Yates,* 912 N.E.2d 805, 808 (Ind. 2009) (citation omitted).  In a policy dispute under Indiana law, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F. Supp. 3d 1015, 1023 (N.D. Ind. 2014) (citation omitted).  "[A]n insured must prove that it has suffered a covered loss before the burden shifts to

---

[7] The parties concede that, to the extent any state law applies, the applicable state law is that of Indiana.  The Court agrees.  In the absence of a stipulation providing otherwise, the law of the state in which an insurance application is made, the premium paid, and the policy delivered governs the interpretation of the insurance policy.  16 Ind. Law Encyc. Ins. § 78 (citing *Travelers Ins. Co. v. Eviston*, 37 N.E.2d 310 (Ind. Ct. App. 1941)).  Here, Beemsterboer alleges that the Policies were delivered to their principal place of business in Indiana.  (DE# 11 ¶ 14.)

the insurer to show an exclusion." *Ports of Indiana v. Lexington Ins. Co.*, No. 1:09-cv-0854, 2011 WL 5523419, at *9 (S.D. Ind. Nov. 14, 2011).

Indiana courts interpret an insurance contract under the same rules of construction as other contracts. *Westfield Cos. v. Knapp,* 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004) (citation omitted). Courts "interpret an insurance policy with the goal of ascertaining and enforcing the parties' intent as revealed by the insurance contract." *Id*. "[C]lear and unambiguous language in an insurance policy should be given its plain and ordinary meaning, even if those terms limit an insurer's liability." *Everett Cash Mut. Ins. Co. v. Taylor,* 926 N.E.2d 1008, 1012 (Ind. 2010) (citation omitted). "Where an ambiguity exists, that is, where reasonably intelligent people may interpret the policy's language differently, Indiana courts construe insurance policies strictly against the insurer." *Auto-Owners Ins. Co. v. Benko*, 964 N.E.2d 886, 890 (Ind. Ct. App. 2012) (citation omitted). However, "an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party." *Beam v. Wausau Ins. Co.,* 765 N.E.2d 524, 528 (Ind. 2002) (citation omitted). Ultimately, "[t]he meaning of an insurance contract can only be gleaned from a consideration of all its provisions, not from an analysis of individual words or phrases. [The Court] must accept

an interpretation of the contract language that harmonizes the provisions rather than the one which supports a conflicting version of the provisions." *Westfield Cos.*, 804 N.E.2d at 1274. The power to interpret contracts does not extend to changing their terms; the Court will not give policies an unreasonable construction in order to provide additional coverage. *Id.*

Policies' Coverage of Claims in the Underlying Complaints

Beemsterboer argues that Continental has a contractual duty to defend the claims made against it in the Underlying Complaints, based on Section 1(A) of the Policies. Continental denies that it has such a duty to defend. An insurer's duty to defend is broader than its duty to indemnify. *Newnam Mfg., Inc. v. Transcon. Ins. Co.,* 871 N.E.2d 396, 401 (Ind. Ct. App. 2007); *see Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.,* 917 N.E.2d 1258, 1267 (Ind. Ct. App. 2010) ("If the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed.").

Indiana courts have determined an insurer's duty to defend based on the allegations in the complaint and "those facts known or ascertainable by the insurer after reasonable investigation." *Newnam*, 871 N.E.2d at 401 (citation omitted). "[W]here an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may properly refuse

to defend." *Id.; see City of Evansville v. U.S. Fidelity and Guar. Co.*, 965 N.E.2d 92, 103 n.9 (Ind. Ct. App. 2012). If the pleadings demonstrate that "a claim is *clearly* excluded under the policy, then no defense is required." *Newnam*, 871 N.E.2d at 401 (emphasis added).

Continental relies upon *Transamerica Insurance Services v. Kopko*, 570 N.E.2d 1283 (Ind. 1991), to argue that the duty to defend in Indiana is determined solely by the nature of the complaint, without regard to extrinsic evidence. *See Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 309 n.8 (7th Cir. 1998) (noting "this Court was bound to rely on the [Indiana Supreme Court's] *Kopko* decision" because "it is not within our province as a reviewing federal appellate court to make federal law, much less state law"). In 2010, the Indiana Court of Appeals explained that *Kopko* no longer reflects the law of Indiana:

> Some courts still cite *Kopko* as representing the current state of Indiana law. But several Indiana Court of Appeals panels have decried *Kopko* and declined to follow it. *See, e.g., Wayne Twp. Bd. of Sch. Comm'rs v. Ind. Ins. Co.*, 650 N.E.2d 1205, 1208 (Ind. Ct. App. 1995) ("[I]n evaluating the factual basis of a claim and the insurer's concomitant duty to defend, this court may properly consider the evidentiary materials offered by the parties to show coverage."). . . .
>
> In any event, our Supreme Court has more recently entertained extrinsic, designated evidence when assessing an insurer's duty to defend. *See Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1291 (Ind. 2006). . . . The Supreme Court thus looked beyond the "eight corners" of the insurance policy and third-party complaint in determining the extent of the insured's defense coverage.

> We understand *Harvey* to permit consideration of evidence extrinsic to the underlying complaint when assessing an insurer's duty to defend.

*Ind. Farmers Mut. Ins. Co.*, 917 N.E.2d at 1267-69 (some citations omitted), *trans. denied,* 929 N.E.2d 796 (Ind. 2010). Because the Indiana Supreme Court considered extrinsic evidence in assessing an insurer's duty to defend in *Harvey*, this Court finds it appropriate to consider extrinsic evidence here. *See Selective Ins. Co. of S.C. v. Erie Ins. Exch.*, 14 N.E.3d 105, 112-13 (Ind. Ct. App. 2014) (considering extrinsic evidence in assessing an insurer's duty to defend).

Beemsterboer argues that the Policies provide for the possibility of coverage for the damages alleged in the Underlying Complaints. Section 1A states in relevant part:

> 1. . . . [Continental] agrees to indemnify the Insured to the extent of this policy's proportion as hereinafter stated of all sums which the Insured shall become obligated to pay:
>
>> A. By reason of the liabilities imposed upon the Insured by law for accidental:
>>
>>> . . .
>>>
>>> 2) loss of or damage to barges, their equipment, cargo, freight, and other interests on board . . . the property of others, while such property is in the custody of the Insured at their landing and mooring facilities described below *resulting from loading or unloading operations performed by or for the Insured;*
>>>
>>> 3) loss of or damage *to property of others (other than as described above)*, including

> vessels . . . approaching, at, and departing
> from the landing and mooring facilities
> described below, or for loss of life or
> personal injury; *if arising out of only those
> operations covered above.*

(DE# 25-1 at 9 (emphasis added).) Beemsterboer asserts that this language provides for the possibility of coverage under the Policies because the Underlying Complaints allege damages to "the property of others" arising out of the "loading or unloading" of pet coke at locations covered by the Policies. Beemsterboer relies upon the Class Action Complaint's allegations that pet coke dust damaged properties near Beemsterboer's Facilities where the pet coke was transported and stored, and the legal and factual question as to "[w]hether Defendants' conduct in the refining, manufacturing, handling, transporting, or storing of oil byproducts resulted in the release, discharge, or spilling of petcoke waste." (DE# 25-2, ¶ 63(b).) Beemsterboer points to the Class Action Complaint's use of terms such as "distribution," "transportation," and "storing," and their derivatives, as indicating that the alleged damage can occur during any phase of the processes at the Facilities. In addition, Beemsterboer relies upon a Class Action plaintiff's deposition testimony that the complaint allegations include property damage generated while pet coke was being transferred from barges at the Facility. (DE# 30-1.)

Regarding the State Amended Complaint, Beemsterboer relies upon the repeated allegations that it was "engaged in the storage, handling, screening, *loading and unloading*" of pet coke (*see, e.g.,* DE# 30-1, Count I ¶ 8 (emphasis added)), that dust from pet coke operations violated state and local air pollution laws, and that loading and off-loading operations may have caused damage to the Calumet River. Beemsterboer points to the Declaration of Simon Beemsterboer as further proof that the loading and unloading of barges potentially could cause the damages claimed in the Underlying Complaints. Mr. Beemsterboer declares that loading and off-loading operations occur by either a bucket loader or conveyor belt, and that pet coke dust was airborne for a short time during the loading and off-loading process. (DE# 29 ¶¶ 11, 12.) Beemsterboer maintains that the allegations of loading and off-loading of pet coke while the barges were docked invoke landing dock bailee liability coverage, and are sufficient to create a duty for Continental to provide a defense under the Policies.

In response, Continental argues that the Policies do not cover the property damage alleged in the Underlying Complaints. Continental asserts that the Policies are "marine hull policies" that cover only Beemsterboer's liability for damage to bailed property, that is, the vessels and their cargo (including damage to vessels and cargo resulting from loading and unloading operations), and property damage to others' vessels approaching,

at, and departing from Beemsterboer's dock if arising out of Beemsterboer's docking operations.

Under Indiana law, "a bailment is an agreement, either express or implied, that one person will entrust personal property to another for a specific purpose and that when the purpose is accomplished the bailee will return the property to the bailor." *Selective Ins. Co.*, 14 N.E.3d at 124 (citation omitted). "Ordinarily when there has been a bailment for mutual benefit, . . . the bailee will be held responsible for damage or loss of the bailor's property only when he has failed to act with ordinary care and diligence." *Ind. Ins. Co. v. Ivetich*, 445 N.E.2d 110, 111 (Ind. Ct. App. 1983) (citations omitted); *see also Cox v. O'Riley*, 4 Ind. 368, 371 (Ind. 1853) ("Wharfingers are not, like common carriers, answerable for all goods that may be intrusted [*sic*] to them in their line of business, except such as may be lost by the act of God or the public enemy. They are responsible for losses only which happen through a neglect to exercise reasonable and ordinary care and diligence.").

In this case, the relevant section of the Policies is entitled, "landing dock bailee liability." Sections 1A(1) and 1A(2) state that Continental is obligated to pay for losses to the "property of others" "while such property is in the custody of the Insured at their landing and mooring facilities described below." (DE# 25-1 at 9.) Section 1A(2) limits recovery "to" barges, cargo

and other interests on board, thus, is limited to the bailed property itself. Section 2 provides that "[c]overage under Clauses 1A(1) and 1A(2) attaches from the moment the said barges or towboats become at risk of the Insured at premises as specified below and covers continuously until removed from said premises, or until no longer at the risk of the Insured." (*Id.*) The Policies' premiums are based on the number of ships that arrive and depart from the Site. (*Id.* at 11.) Based on these provisions, coverage under Sections 1A(1) and 1A(2) limit coverage to bailed property.

Beemsterboer, however, relies upon Section 1A(3) as the basis for coverage for the property damage alleged in the Underlying Complaints. The parties disagree over the meaning of the phrase "property of others" in Section 1A(3). Continental insists that the phrase "property of others" refers only to vessels because Sections 1A(1) and 1A(2) refer to cargo "on board" the "property of others," and limit the "property of others" to "such property in the custody of the Insured at their landing and mooring facilities." Because Section 1A(3) limits coverage to property damage and bodily injury "arising out of only those operations covered" in Sections 1A(1) and 1A(2), Continental insists that the damage to "property of others" in Section 1A(3) must arise out of damage to bailed vessels or their cargo.[8]

---

[8] Beemsterboer notes that Sections 1A(1) and 1A(2) describe the covered property differently. Section 1A(1) covers damage to

Under Continental's limited interpretation of "property of others," it would have no duty to defend Beemsterboer in the Underlying Complaints because Beemsterboer has no legal liability as a bailee to the plaintiffs in the Underlying Complaints. The Class Action Complaint does not allege damage to bailed property in Beemsterboer's custody, but rather, alleges damage to the Class Action plaintiffs' property surrounding the Facilities. The State Amended Complaint alleges damage to the air and water due to Beemsterboer's operations at the Facility, rather than damage to any bailed property.

Continental cites maritime insurance cases to support its assertion that wharfinger insurance policies do not cover property damage on docks. In *Paktank Louisiana, Inc. v. Marsh & McLennan, Inc.*, 688 F. Supp. 1087 (E.D. La. 1988), Paktank leased a marine

---

"barges and to towboats, their equipment, cargo, freight, and other interests on board . . . *,* the property of others while such property is in the custody of the Insured." (DE# 25-1 at 9 (emphasis added).) The comma after "on board" seems to indicate that the "property of others" is distinct from the equipment, cargo, freight, and other interests on board the vessels. In contrast, Section 1A(2) covers damage "to barges, their equipment, cargo, freight and other interest on board . . . the property of others, while such property is in the custody of the Insured." (*Id.*) The lack of a comma in Section 1A(2) indicates that the "property of others" is only covered if it is on board a vessel. The Court need not decide this issue, however, because both Sections 1A(1) and 1A(2) require that the "property of others" be in the custody of the Insured. The Underlying Complaints do not allege that any property was damaged while in Beemsterboer's custody.

terminal from Gold Bond. While Paktank was constructing improvements at the terminal, a fire destroyed some of Gold Bond's property. *Id.* at 1089. Gold Bond sued Paktank and others for damages, and eventually settled with Paktank's property insurer. *Id.* Paktank and its property insurer sued Paktank's liability insurer for indemnification. *Id.* The court reviewed the property insurance policy and found that "'the property of others for which the Insured may be liable' is an unambiguous phrase providing property damage coverage for the property of others where Paktank has a present and existing general responsibility by virtue of a bailment." *Id.* at 1090-91. Because Paktank was not Gold Bond's bailee, the property policy did not cover the damage to Gold Bond's property. *Id.* at 1091. The court also considered the liability policy, and found that it did not cover the loss of Gold Bond's dock because it only "provides coverage for damage to any interest on board any vessel or property damage caused by any of Paktank's vessels." *Id.* at 1092, n.6.

Continental also relies upon *Winningham v. Sexton*, 820 F. Supp. 338 (S.D. Ohio 1993). In that case, Winningham was a longshoreman whose duties included moving a conveyor between the Ohio River and a railroad on one side of the terminal. Winningham was electrocuted when he tried to untangle the conveyor he was moving from some high voltage power lines. He sought coverage for

his injuries under the property owner's wharfinger insurance policy, which stated in part:

> A. This insurance covers the legal liability of the Assured for loss or damage to any vessels and equipment, cargos, freights and other interests on board, which are in the care, custody or control at or in the vicinity of the Assured's landing(s) on the:  Ohio River at Mile 474.6.
>
> B. This insurance also covers the legal liability of the Assured for loss or damage to property other than that referred to in paragraph A, hereof caused by said vessels and their cargos which are in their care, custody, or control, or for loss of life or personal injury if arising out of only those operations covered above.

*Id.* at 340.  The insurer filed an action seeking a declaration that the policy did not cover Winningham's injury because he was not on board a vessel when injured.  The court agreed, finding that the policy only covered personal injury claims that occur "on board" a vessel located "at or in the vicinity" of the landing. *Id.* at 342.  The court rejected Winningham's argument that his injuries were covered because they arose out of "operations" at the landing, finding that the policy only covered operations if they would have been covered under Paragraph A, which required operations to have taken place "on board." *Id.* at 342–43.  In affirming this ruling on appeal, the Sixth Circuit added that the policy did not cover property damage incurred during the loading or unloading of cargo because it specifically "exclude[d] from coverage any loss or damage to cargo being loaded or unloaded."

*Winningham v. N. Am. Res. Corp.*, 42 F.3d 981, 985 (6th Cir. 1994). While Paragraph B expanded the scope of the policy to include coverage for personal injuries, the injuries must have arisen out of an operation covered by Paragraph A. *Id*. The Sixth Circuit found that "[b]ecause Paragraph A does not cover damages incurred during the loading and unloading of cargo, a personal injury incurred during such operations would not be covered." *Id*.[9]

Continental asserts that this Court should follow *Paktank*'s and *Winningham*'s narrow interpretations of the scope of wharfinger insurance policies to find that the Policies do not cover the alleged damage to the Class Action Litigation and State Litigation plaintiffs' property. The holdings in these cases are of some interest, but their facts are distinguishable. The policies at issue in *Paktank* did not contain language similar to the Policies' Section 1A(3), and, unlike the Policies, specifically limited coverage to the property of others "for which the Insured may be liable." *See* 688 F. Supp. at 1090-91. *Winningham* addressed whether a policy covered a personal injury caused by operations that were excluded by the policy; it did not decide whether the

---

[9] Continental also relies upon *Essex Insurance Co. v. Detroit Bulk Storage*, No. 11-13277, 2014 WL 3687032 (E.D. Mich. July 23, 2014), in which the court applied Michigan contract law to find that a wharfinger insurance policy unambiguously required cargo to be "on board" a vessel when damaged in order to be covered. *Id*. at *8-*9. This case is distinguishable because the Underlying Complaints do not allege damage to any cargo.

policy covered property damage caused by operations covered by the policy, (*i.e.,* operations occurring "on board"), even if the damage was not "on board."  Continental argues that the *Winningham* district court "made it very clear that it wasn't the operation that had to occur on board, but rather the property damage and/or bodily injury."  (DE# 33 at 14.)  While the district court did rely upon the fact that Winningham was not injured "on board" to deny coverage, this Court remains unpersuaded because the district court did not decide the issue of coverage for property damage based on a covered operation.  Moreover, on appeal, the Sixth Circuit relied on the policy's exclusion of loading and unloading operations as a basis for denying coverage for Winningham's injuries. *See Winningham*, 42 F.3d at 985.  Here, in contrast, the Policies cover damage to the "property of others" resulting from the operations at issue, *i.e.*, loading or unloading operations. The outstanding issue is the meaning of the phrase "property of others" in Section 1A(3).  Continental's cited cases do not address this issue, nor do they eliminate Indiana's requirement that the Court look first to the relevant policy language in deciding the scope of coverage. *See Ohio Cas. Ins. Co. v. Reed,* No. 1:04-cv-2027, 2006 WL 2348957, at *10 (S.D. Ind. Aug. 11, 2006).

Unlike Sections 1A(1) and 1A(2), the language of Section 1A(3) does not specifically limit "property of others" to bailed property.  Section 1A(3) lacks any reference to the property of

others being "on board" or "in the custody of the Insured at their landing and mooring facilities." Section 1A(3) states that it covers damages to the "property of others" "other than as described above" in Sections 1A(1) and 1A(2). Section 1A(1) describes the covered damages as "damage to barges and to towboats, their equipment, cargo, freight, *and other interests on board* . . . , *the property of others* while such property is in the custody of the Insured . . . ." (DE# 25-1 at 9 (emphasis added). Section 1A(2) describes the covered damages as "damage to barges, their equipment, cargo, freight, and *other interests on board . . . the property of others,* while such property is in the custody of the Insured . . . ." (*Id.* (emphasis added).) Thus, both Sections 1A(1) and 1A(2) cover "other interests on board" while in Beemsterboer's custody. Because Sections 1A(1) and 1A(2) cover damage to vessels and "other interests on board" the property of others in Beemsterboer's custody, and Section 1A(3) covers damage to property of others "other than as described above," Section 1A(3) arguably covers something other than damage to vessels in Beemsterboer's custody, and the property on those vessels. *See Carroll Creek Development Co., Inc. v. Town of Huntertown*, 9 N.E.3d 702, 709 (Ind. Ct. App. 2014) ("A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless."); *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012) (courts must construe

contracts "so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole").[10]

Continental argues that Section 1A(3) is intended to cover a wharfinger's duty of "safe berth," which extends to vessels approaching and departing the wharf. Section 1A(3) does cover "damage to property of others (other than described above), *including* vessels of not exceeding 750 net registered tons approaching, at and departing from the landing and mooring facilities described below. . . ." (DE# 25-1 at 9 (emphasis added).) But the use of the term "including" in Section 1A(3) undermines Continental's analysis because this word generally indicates a partial or nonexclusive list. *See* Black's Law Dictionary (10th ed. 2014) ("The participle *including* typically indicates a partial list."); Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/including (defining "include" as "to take in or comprise as a part of a whole or group," "to have (someone or something) as part of a group or total," "to contain (someone or something) in a group or as a part of something," and "to make (someone or something) a part of something"); *see also In re Order for Payment of Attorney Fees,*

_____

[10] The Court notes that while the language of Section 1A is somewhat similar to the language of Paragraphs A and B of the policy at issue in *Winningham*, neither the Southern District of Ohio nor the Sixth Circuit addressed the meaning of "damage to property other than referred to in paragraph A" in light of the reference to "other interests on board" in Paragraph A.

*Reimbursement of Expenses*, 7 N.E.3d 289, 293 (Ind. Ct. App. 2014) ("Where the term 'including' is used in a statute, it implies that the list or items enumerated are non-exclusive and are merely examples.") (citation omitted). The term "including" does not specifically limit the "property to others" to vessels approaching, at, and departing from the Facility. Because the term "including" is, at best, ambiguous, the Court must construe it against Continental, and find that Section 1A(3) is not limited to vessels approaching, at, and departing from the Facility. *See Auto-Owners Ins. Co.*, 964 N.E.2d at 890 ("Where an ambiguity exists . . . Indiana courts construe insurance policies strictly against the insurer.").

Finally, Section 1A(3) limits coverage to damages to the property of others "arising out of only those operations" covered in Sections 1A(1) or 1A(2). As noted above, Section 1A(2) specifically includes "loading or unloading *operations* performed by the Insured." Construing the Policies in Beemsterboer's favor, the Section 1A(3) covers damages to "property of others" resulting from loading and unloading operations at the Facility.

Continental argues that Beemsterboer's interpretation of Section 1A(3) is unreasonable and contrary to the plain language of the Policies because it attempts to cover "any and all damage to any third party property of any kind, as long as at least some of that damage may possibly have been partially caused by the

loading and off-loading of docked barges." (DE# 32 at 20.) This interpretation of Section 1A(3) is certainly broader than the coverage afforded in Sections 1A(1) and 1A(2). However, as the author of the Policies, Continental could have limited Section 1A(3) to coverage for damages to the property of others "on board" or "in the custody of the Insured." It did not do so. Rather, Section 1A(3) pronounces the "property of others" to be something "other than as described above" in Sections 1A(1) and 1A(2). Because the "property of others" in Section 1A(3) is something other than as described in Sections 1A(1) and 1A(2), the Court find this term to be ambiguous. Given the ambiguity in Section 1A(3), the Court is required to construe this provision against Continental, and finds that the term "property of others" in Section 1A(3) is not limited to property on vessels in Beemsterboer's custody.

Continental also argues that Beemsterboer overstates the coverage afforded under the "loading or unloading operations" clause in Section 1A(2). In the context of an automobile insurance policy, the Indiana Supreme Court has explained:

> Before there is coverage under a policy extending to loading and unloading, there must be [s]ome connection between the use of the insured vehicle and the injury, and unless the court can determine that the loading or unloading of the vehicle was an efficient and producing cause of the injury, there is no right of indemnity for the accident. In other words, liability of an insurance company under the policy depends on the existence of a causal relationship between the loading or unloading and

> the injury, and *if the injury was proximately due to the unloading, the insurance company is liable, while if the accident had no connection with the loading or unloading there is no liability*.

*Ind. Lumbermens Mut. Ins. v. Statesman Ins. Co.,* 291 N.E.2d 897, 899 (Ind. 1973) (citation omitted, emphasis added). In *Indiana Lumbermens*, the Court found an automobile insurance policy did not cover the alleged injuries because the use of the insured vehicle had no connection to the accident at issue.[11] *Id*. There, the accident at issue was caused by the negligent maintenance of a flight of stairs, rather than the use of the insured vehicle.

As noted above, both the Class Action Complaint and the State Amended Complaint arguably allege claims that damage resulted from the loading and unloading of pet coke from barges at the Facilities. The Class Action Complaint raises the legal and factual question as to whether Beemsterboer's conduct in the "handling, transporting, or storing" of pet coke resulted in the release of pet coke waste. (DE# 25-2 ¶ 63(b).) In addition, a Class Action plaintiff testified that the property damage alleged in the Class Action Complaint includes damage generated while pet coke was being transferred from barges and ships. (DE# 31-1.)

---

[11] The Court notes that because the insured was not a party in *Indiana Lumbermens*, the Indiana Supreme Court was "not in a situation where we must construe the contract language any certain way and can seek out the general intent of the contract from a neutral stance." 291 N.E.2d at 899. Here, the Court must construe the Policies in the insured's favor.

The State Amended Complaint repeatedly alleges the damages relating to pet coke loading and unloading operations at the Facility.

Continental claims that Beemsterboer strains to read the loading and unloading of boats into the Underlying Complaints, and maintains that that "real source" of the alleged damages is the uncovered storage piles of pet coke at the Facilities. (DE# 33 at 10.) It cites two Indiana cases to support its position that the Court should examine the "primary thrust" of a complaint in determining an insurer's duty to defend. (DE# 33 at 10-11 (citing *City of Evansville*, 965 N.E.2d at 99, and *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Serv.*, 865 N.E.2d 571, 579 (Ind. 2007)).) In *City of Evansville* v. *United States Fidelity and Guaranty Company,* the court found that the "the primary thrust of the [underlying] federal lawsuit is to require the power companies to incur the costs of installing government-mandated equipment intended to reduce future emissions of pollutants and prevent future environmental harm." 965 N.E.2d at 99 (quoting *Cinergy*, 865 N.E.2d at 579). Both courts held that the insurer had no duty to defend the underlying litigation because the prevention of future environmental harm sought (rather than the remediation of past contamination) was not an "occurrence" under insurance policies at issue. *See City of Evansville*, 965 N.E.2d at 103 (citing *Cinergy*). The Court reads the *City of Evansville* and *Cinergy* courts'

reference to the "primary thrust" of the underlying complaint as limited to describing the underlying litigation at issue in those cases.

This Court is more persuaded by Indiana case law holding that an insured has a duty to defend unless it is clear that the policy excludes a claim. *See, e.g., Newnam*, 871 N.E.2d at 401 (where "the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required"); *5200 Keystone Ltd. Realty, LLC v. Netherlands Ins. Comp.*, 29 N.E.3d 156, 161 (Ind. Ct. App. 2015) (same); *Jim Barna Log Sys. Midwest, Inc. v. General Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003) ("when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend") (citations omitted); *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (same). Indeed, *City of Evansville* notes that "[i]f the pleadings reveal that a claim is *clearly* excluded under the policy, then no defense is required." 965 N.E.2d at 103 n.9 (emphasis added). The Court finds that the Underlying Complaints allege damage to the property of others arising – at least in part – from Beemsterboer's loading and unloading operations, and that Section 1A does not clearly exclude these claims from coverage. However, the Court's analysis does not end here.

## Continental's Exclusions

Continental argues that it has no duty to defend or indemnify Beemsterboer because coverage is barred by two exclusions in the Policies: (1) Exclusion K; and (2) the Respirable Dust Exclusion. A coverage exclusion is usually an affirmative defense, with the insurer bearing the burden of proof. *Hoosier Ins. Co. v. Audiology Found. of Am.,* 745 N.E.2d 300, 309 (Ind. Ct. App. 2001). "Generally, insurers are allowed to limit liability in any manner which is not inconsistent with public policy." *Id.* "[A]n unambiguous exclusionary clause is ordinarily entitled to enforcement." *Id.* However, exclusions must be plainly expressed and clear, and any doubts as to coverage will be construed against the insurer. *Id.*; *Wells v. Auto Owners Ins. Co.*, 864 N.E.2d 356, 358 (Ind. Ct. App. 2007).

### Exclusion K

Continental maintains that the allegations in the Underlying Complaints fall within the scope of the Policies' exclusion under Exclusion K, and therefore the complaints are barred from coverage. Exclusion K excludes insurance coverage:

> For any loss, damage, cost, liability or expense of any kinds or nature whatsoever, imposed on the insured, directly or indirectly in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of oil, *petroleum products*, chemicals or other substances of any kind or nature whatsoever.

(DE# 25-1 at 11 (emphasis added).)  Because pet coke is made from petroleum, Continental argues that the claims in the Underlying Complaints fall within this exclusion.

Beemsterboer responds that Indiana courts have held pollution exclusion clauses similar to Exclusion K to be invalid, and have construed them against insurers.  *See Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 (Ind. 1996) (concluding that pollution exclusion "cannot be read literally as it would negate virtually all coverage"); *State Auto. Mut. Ins. Co. v. Flexdar,* 964 N.E.2d 845, 850 (Ind. 2012) (observing that Indiana courts have "consistently construed the pollution exclusion against insurance companies") (citation and quotation omitted).  "Applying basic contract principles, [Indiana court] decisions have consistently held that the insurer can (and should) specify what falls within its pollution exclusion. . . .  Where an insurer's failure to be more specific renders its policy ambiguous, [Indiana courts] construe the policy in favor of coverage."  *Flexdar*, 964 N.E.2d at 851.  Indiana courts have consistently recognized "the requirement that language of a pollution exclusion be explicit," and refused to apply a pollution exclusion on grounds of ambiguity.  *Id*. at 852.  The question is whether the language in the Policies is sufficiently unambiguous to identify pet coke as one of the "petroleum products" covered by Exclusion K.

Beemsterboer asserts that the term "petroleum products" in Exclusion K is ambiguous given the vast number of products made from petroleum, including all types of plastic products. Beemsterboer asserts that because the term "petroleum products" is vague, the Court should refuse to apply Exclusion K on the grounds of ambiguity. Continental appears to concede this point, as it fails to reply to Beemsterboer's argument in its summary judgment briefs. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived). The Court finds that Exclusion K is ambiguous as to whether "petroleum products" includes pet coke. Because Continental's failure to be more specific renders Exclusion K ambiguous, the Court construes Exclusion K against Continental, and finds that it does not exclude coverage for the allegations in the Underlying Complaints.

Respirable Dust Exclusion

Continental also argues that the allegations in the Underlying Complaints fall within the scope of the Respirable Dust Exclusion because they allege property damage and bodily injury that arose at least partly from respirable dust.[12] The Respirable

---

[12] In response to Continental's motion for partial summary judgment, Beemsterboer asserts that "this is the first time in the entire course of Continental's claim handling and of this litigation that Continental has claimed any exclusion could apply to this case."

Dust Exclusion provides that the insurance "does not apply to any liability for, or any loss, damage, injury or expense caused by, resulting from, or incurred by reason of"

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust"; or

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust."

(DE# 25-1 at 27.) The Policies define "respirable dust" as "respirable particulate matter but does not include living organisms." (*Id.*) The term "respirable" is undefined in the Policies. The Merriam-Webster Dictionary defines "respirable" as "fit for breathing" and "capable of being taken in by breathing <respirable particles of ash>." Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/respirable; *see Lightning Rod Mut. Ins. Co. v. Cole,* No. 3:10–CV–00428, 2012 WL 4355535, at *5 (N.D. Ind. Sept. 21, 2012) (where a policy term is undefined, a court "must consider the term using principles of contract and insurance construction, which require that words be given their plain and ordinary meaning while construing the insurance policy as a whole") (citation omitted); *Everett Cash*

---

(DE# 31 at 17.) This does not appear to be true. Continental raised the Respirable Dust Exclusion in its August 29, 2014 denial letter to Beemsterboer (DE# 33-1 at 6-7), and as one of its Affirmative and Other Defenses to Beemsterboer's Amended Counterclaims (DE# 15 at 20, ¶ 2).

*Mut. Ins. Co.*, 926 N.E.2d at 1012 (noting "clear and unambiguous language in an insurance policy should be given its plain and ordinary meaning").

Citing no case law, Beemsterboer asserts that the Respirable Dust Exclusion does not apply to the Underlying Complaints because the exclusion is "too ambiguous considering that there is a scientifically accepted definition of respirable dust" from the United States Occupational Safety and Health Administration ("OSHA").[13] (DE# 31 at 19.) Beemsterboer cites no authority for the proposition that the Court should disregard the definition of "respirable dust" contained in the Respirable Dust Exclusion for another, more scientific definition. The fact that the exclusion specifically defines "respirable dust" indicates the parties' intent to rely upon such definition, rather than some other scientific definition found outside the four corners of the policy. *See* 43 Am. Jur. 2d Ins. § 291 ("where an insurance policy defines certain words or phrases, a court must defer to the definition provided by the policy"). Moreover, in offering this alternative

---

[13] Beemsterboer cites OSHA's website, which defines respirable dust as:

> those dust particles that are small enough to penetrate the nose and upper respiratory system and deep into the lungs. Particles that penetrate deep into the respiratory system are generally beyond the body's natural clearance mechanisms of cilia and mucous and are more likely to be retained.

https://www.osha.gov/dsg/topics/silicacrystalline/dust/chapter_1.html.

definition of respirable dust, Beemsterboer asks the Court to consider parole evidence. "Indiana follows 'the four corners rule' that extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." *Univ. of S. Indiana Found. v. Baker,* 843 N.E.2d 528, 532 (Ind. 2006) (citation and internal quotations omitted); *see John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014) ("Extrinsic evidence cannot be used to create an ambiguity."). The Court finds that the Respirable Dust Exclusion and the term "respirable dust" are clear and unambiguous. *See* 43 Am. Jur. 2d Ins. § 283 ("The fact that a term of an insurance policy is broad in scope does not necessarily make it ambiguous"). As such, it will not consider extrinsic evidence to vary the Policies' definition of "respirable dust."[14]

---

[14] Other courts applying Indiana law have found that insurance policies limited coverage based on the policies' defined terms. For example, the Seventh Circuit applied Indiana law to find that a pollution exclusion excluded gasoline contamination from coverage where the exclusion "clearly includes motor fuels," and "motor fuels" was defined to include gasoline. *W. Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.,* 598 F.3d 918, 923 (7th Cir. 2010); *see Valiant Ins. Co.,* 35 F. Supp. 3d at 1029 (holding that a legal malpractice insurance policy that limited coverage to suits seeking "damages" and defined "damages" as excluding sanctions did not provide coverage for a sanctions motion against the insured); *Midwest Mut. Ins. Co. v. Indiana Ins. Co.,* 412 N.E.2d 84, 87 (Ind. Ct. App. 1980) (explaining that where the policy defined "motor vehicle" to include a motorcycle, if the insurer had intended to exclude the insured's motorcycles, "it could have and should have

A review of the Underlying Complaints shows that the claims for which Beemsterboer seeks coverage allege damage based on pet coke dust. The Class Action Complaint alleges that pet coke can be inhaled (*i.e.*, is respirable), and that doing so can be dangerous. (DE# 25-2 ¶ 48.) It attaches as exhibits a Safety Data Sheet for pet coke indicating that pet coke contains dust that may be inhaled, as well as an IEPA violation notice in which Beemsterboer was charged with having "caused, threatened, or allowed the discharge of particulate matter into the atmosphere generated during material handling and storage operation causing or tending to cause air pollution" in 2013. (DE# 25-2 at 36-42, 63.) It alleges damage to the Class Action plaintiffs' property due to the alleged presence of pet coke dust.

The State Amended Complaint alleges that Beemsterboer caused the emission of "particulate matter" including pet coke, and that such particulate matter can be inhaled. It includes several claims relating to respirable "particulate matter," including allegations that Beemsterboer "caus[ed] or threaten[ed] the emission of Particulate Matter so as to cause air pollution." (DE# 30-1 Count I ¶¶ 20, 30-31.) It alleges that such particulate matter has damaged the property of third parties, violated Illinois and municipal air pollution regulations, and demands that Beemsterboer

chosen to use the words 'motor vehicle' in the exclusion" at issue).

pay all costs of clean-up.  Based on these allegations, the Court finds that the Underlying Complaints allege property damage arising at least "in part out of the . . . alleged or threatened presence of 'respirable dust.'"

Beemsterboer argues that the Respirable Dust Exclusion does not apply here because it was intended to avoid coverage for workplace injuries due to fine particles that may be inhaled during work hours.   In support, Beemsterboer points to the Silica Exclusion, Microbe Exclusion, and Asbestos Exclusion found in the Policies.  Beemsterboer characterizes these three exclusions as excluding coverage for potential workplace injuries, but cites no authority for such characterization, and the language of the exclusions do not indicate such limitation.  Moreover, the Indiana Supreme Court has held that "[i]f any one exclusion applies there should be no coverage, regardless of the inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions." *Indiana Ins. Co. v. DeZutti,* 408 N.E.2d 1275, 1278 (Ind. 1980).

Beemsterboer also asserts that the Respirable Dust Exclusion does not apply because the Class Action Complaint does not seek any damages from the inhalation of pet coke dust.  While Section 1 of the Respirable Dust Exclusion excludes coverage for damages due to the respiration or ingestion of respirable dust, Section 2 also excludes from coverage "'[p]roperty damage' arising in whole

or in part out of the actual, alleged or threatened presence of 'respirable dust.'" (DE# 25-1 at 27.) Thus, the exclusion is not limited to damages caused by the inhalation of respirable dust. Beemsterboer has acknowledged that the Underlying Complaints allege property "damages caused by pet coke dust." (DE# 26 at 10 ("Alleged damages caused by pet coke dust created during the loading and off-loading activities . . . , and the dust, which caused the alleged damage, is caused as a result of the unintentional releases during the covered activity of loading and off-loading."); see DE# 34 at 14 (asserting that the Class Action Complaint "claims damages for the pet coke dust coating the plaintiffs' properties, and the removal and maintenance issues it causes").)

Beemsterboer asserts, without any elaboration, that the Respirable Dust Exclusion "could not apply to the State Litigation" because it "alleges damage to the waterways of Illinois and not damage due to dust migration." (DE# 31 at 17.) As noted above, the State Amended Complaint includes several claims relating to air pollution, and thus, is not limited to damage to waterways of Illinois. Continental acknowledges that the State Amended Complaint also includes counts pertaining to water pollution (Counts XIV through XVII) and the long-term storage of flue dust at the Facility (Counts XVIII and XIX). Continental admits that these claims "are not barred by the Respirable Dust Exclusion,"

but argues that they are not covered by the Policies because they do not reference anything remotely to do with boats, or vessel loading or unloading. (DE# 32 at 23.) The Court agrees. Counts XIV through XVII allege water pollution caused by storm water runoff from the uncovered piles of Unpermitted Materials, including pet coke. (DE# 30-1.) Counts XVIII and XIX allege violations of Illinois waste storage laws based on the storage of flue dust at the Facility "in a vegetated pile for approximately twenty seven (27) years." (*See id*. Count XVIII ¶ 23.) Because Counts XIV through XIX of the State Amended Complaint do not allege damage to the property of others arising from loading or unloading operations, the Court finds that they are not covered by the Policies.[15]

The Court finds that the Respirable Dust Exclusion applies to exclude coverage for the claims against Beemsterboer in the Class Action Complaint. The Court further finds that the Policies do not provide coverage for Counts XIV through XIX of the State Amended Complaint, and that the Respirable Dust Exclusion applies to exclude coverage for the other claims against Beemsterboer in

---

[15] In Continental's reply to its motion or partial summary judgment, Continental argues that the Respirable Dust Exclusion does apply to Counts XIV through XIX of the State Amended Complaint "because plaintiffs' alleged 'property damages' claims arise in whole or in part out of the present of respirable dust." (DE# 33 at 13.) Continental did not elaborate on this argument. Because the State Amended Complaint was not the subject of Continental's motion for partial summary judgment, the Court will not address this argument.

the State Amended Complaint.  Because the Policies do not provide coverage, Continental has no duty to defend Beemsterboer in the Class Action Litigation or the State Litigation.  The Court therefore **GRANTS** Continental's motion for partial summary judgment, and **DENIES** Beemsterboer's motion for partial summary judgment.

CONCLUSION

For the reasons set forth above, Continental's Motion for Partial Summary Judgment (DE# 23) is **GRANTED.**  Beemsterboer's Motion for Partial Summary Judgment (DE# 24) is **DENIED.**

DATED:  December 8, 2015          **/s/ RUDY LOZANO, Judge**
                                 **United States District Court**